IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

Clinton Eugene Gilley, as Administrator
of the Estate of CARL DAVID GILLEY,
Nicole Leigh Le, as Administrator of the
Estate of CHRISTINE TARA WARDEN GILLEY,
and Clinton Eugene Gilley and Nicole
Leigh Le as Co-Administrators of the
Estates of J.G. and G.G., minor children,

     Plaintiffs,

v.                         CIVIL ACTION NO. 1:18-00536

C.H. ROBINSON WORLDWIDE, INC.,
J&TS TRANSPORT EXPRESS, INC.,
and BERTRAM COPELAND,

     Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

     Pending before the court is defendant C.H. Robinson's motion for summary judgment.[1] (ECF No. 186.) For the reasons that follow, the motion is **GRANTED** in part and **DENIED** in part.

**I.    Background**

     This case arises from a collision between a tractor-trailer and a passenger vehicle resulting in the deaths of the four occupants of the passenger vehicle. The collision occurred on Interstate 77 near Camp Creek in Mercer County, West Virginia, when the tractor-trailer crossed the median and struck the

---

[1] As stated in the conclusion section, subsidiary motions not requiring analysis are also pending and will be resolved by this Memorandum Opinion and Order.

passenger vehicle.  Plaintiffs are the family members of the
deceased.  Defendant Bertram Copeland ("Copeland") was the
driver of the tractor-trailer.  Defendant J&TS Transport
Express, Inc. ("J&TS") was his employer.  Defendant C.H.
Robinson ("Robinson") was the broker for the shipment, which
consisted of canned goods bound for an Aldi supermarket in North
Carolina.

## II.  <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56(a) provides:

> A party may move for summary judgment, identifying
> each claim or defense—or the part of each claim or
> defense—on which summary judgment is sought.  The
> court shall grant summary judgment if the movant shows
> that there is no genuine dispute as to any material
> fact and the movant is entitled to judgment as a
> matter of law.

The moving party has the burden of establishing that there is no
genuine issue as to any material fact.  <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 323 (1986).  This burden can be met by
showing that the nonmoving party has failed to prove an
essential element of the nonmoving party's case for which the
nonmoving party will bear the burden of proof at trial.  <u>Id.</u> at
322.  This is so because "a complete failure of proof concerning
an essential element of the nonmoving party's case necessarily
renders all other facts immaterial."  <u>Id.</u> at 323.

Once there is a proper challenge to the sufficiency of the
nonmoving party's evidence on an essential element, the burden

shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find, by a preponderance of the evidence, that the plaintiff is entitled to a verdict . . . .

Id. at 252.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 250-51.  All reasonable inferences are to be drawn in the nonmoving party's favor.  See id. at 255.

III. **Discussion**

Plaintiffs have alleged two causes of action against Robinson:  vicarious liability and negligent selection.[2] Robinson argues that it is entitled to summary judgment as to both causes of action on preemption grounds and, separately,

---

[2] A claim for negligent selection of an independent contractor is also called a claim for negligent hiring of an independent contractor.  Courts, including the Supreme Court of Appeals of West Virginia, use these labels interchangeably.  See Kizer v. Harper, 561 S.E.2d 368, 372 (W. Va. 2001) (per curiam) ("We discussed and adopted a cause of action for negligent hiring or selection in Thomson v. McGinnis, 195 W.Va. 465, 465 S.E.2d 922 (1995), holding that one who undertakes to hire an independent contractor who is not careful or competent can be held liable for resulting damages caused by the independent contractor if the hiring entity is negligent in the selection and retention of the independent contractor.").

that each cause of action fails because plaintiffs cannot establish its essential elements.  Robinson is wrong that plaintiffs' claims are preempted and that there is no triable issue of fact as to the negligent selection claim.  Robinson is right, however, that there is no triable issue of fact as to the vicarious liability claim.

Express preemption does not apply because the language of the federal law at issue does not sweep this claim within its preemption ambit, and even if it did, the safety clause would apply.  Obstacle preemption does not apply because the tort claims obstruct no important federal interest.  The negligent hiring claim will proceed because there are triable issues of fact.  Contrastingly, the vicarious liability claim will not proceed because the only reasonable inference from the record is that J&TS (including its driver, Copeland) was acting as an independent contractor.  Thus, the court will grant summary judgment as to the vicarious liability claim only.

Regarding plaintiffs' negligent selection claim, Robinson conflates the existence of an applicable industry standard with the existence of an applicable standard of care by analogizing too strongly to the deliberate indifference context.  Unlike in that context, the breach of a state or federal law or an industry standard is not imperative here.  The causation argument carries more weight, but the evidence of causation is

4

not so slim as to remove this question from the province of the
factfinder.  Contrastingly, the evidence of Robinson's control
of the carrier's relevant conduct is slim enough such that no
factfinder could reasonably conclude that J&TS and Copeland were
agents of Robinson.  While it is true that the line between
broker and carrier is somewhat blurred here, and while slightly
different facts may blur the line enough to create a jury
question, the line is just sharp enough that only one conclusion
is reasonable.

### a. Preemption

Neither express nor obstacle preemption defeats the tort
claims at issue here.  The tort claims relate to the prices,
routes, and services of brokers only peripherally.  And they
stand in the way of no important federal interest.

### 1. Express Preemption

Having carefully reviewed its previous opinion (ECF No. 82)
and Robinson's renewed express preemption argument, the court
remains unconvinced that express preemption applies.  The court
reaffirms its previous determination that the express preemption
argument fails at step one of the analysis, and even if not,
would fail at step two.  The court respectfully disagrees with
the opinion of the United States Court of Appeals for the Ninth
Circuit in Miller v. C.H. Robinson Worldwide, Inc. insofar as
that court found in a similar case that the preemption argument

did not fail at step one.  See 976 F.3d 1016, 1023-25 (9th Cir. 2020).

### 2. Obstacle Preemption

Robinson raises a new preemption argument in its motion for summary judgment.  It says that plaintiffs' claims are preempted because they pose an obstacle to important federal objectives. The purported federal objectives here are uniformity and efficiency in the trucking industry.  The argument appears to be that federal motor carrier registration requirements strike a balance between cost and safety, and the tort claims here impermissibly disrupt that balance.  If a carrier is federally registered, Robinson appears to suggest, it bears the federal imprimatur of fitness for the road, period.  Robinson further argues that the increased costs that may follow if it cannot rely solely on federal registration when selecting carriers are anathema to Congress's desire to deregulate the trucking industry and let the market decide which carriers get business.

The obstacle preemption argument fails because the state law tort claims jeopardize no important federal interest.  In the area of obstacle preemption, citing overarching goals of federal law and saying that state law hinders them is generally insufficient.  Moreover, the existence of federal licensing requirements does not establish a federal objective of setting maximum competency standards for purposes of tort liability.  In

other words, there is no indication that federal registration
requirements were intended to set a ceiling on carrier
competency.

Robinson cites two cases in support of its obstacle
preemption argument: Geier v. Am. Honda Motor Co., 529 U.S. 861
(2000), and Rowe v. New Hampshire Motor Transp. Ass'n, 552 U.S.
364 (2008). Rowe was an express preemption case and does not
apply here. And Geier is not on point. At issue in Geier was a
products liability claim that a 1987 Honda was defective for
lack of airbags even though, in 1987, a federal regulation
expressly made air bags optional. 529 U.S. at 865-66. The
Court held that, by retrospectively mandating airbags, the tort
claim would stand as an obstacle to multiple important federal
objectives imbedded within the regulation. Id. at 881. Those
objectives were to effect (1) a "variety and mix of [safety]
devices" instead of airbags across the board; (2) "the gradual
passive restraint phase-in"; and (3) the adoption of state
buckle-up laws. Id. According to the Supreme Court, it was for
"safety-related reasons" that the regulation gave manufactures a
choice, and because the no-airbag lawsuit would retrospectively
take that choice away, it was preempted as an obstacle to
safety-related goals. Id. at 886.

Nine years later, the Supreme Court decided Wyeth v.
Levine. 555 U.S. 555 (2009). Wyeth was another products

7

liability case.  Id. at 558-60.  The plaintiff alleged injuries resulting from a drug manufacturer's failure to warn of the risk of "IV-push" administration of a drug.  Id.  The Food and Drug Administration had approved the label. Id. at 560-61.  The manufacturer argued that the tort claim would stand as an obstacle to the important federal purpose of delegating to "an expert agency" the responsibility "to make drug labeling decisions that strike a balance between competing objectives." Id. at 573.  It further argued that the Federal Food, Drug, and Cosmetic Act "establishe[d] both a floor and a ceiling for drug regulation."  Id.  These arguments had "no merit" with the Court.  Id.  Although the case bore superficial resemblance to Geier, the Court decided that the claim was not preempted.  See id. at 579-81.

Judge Goodwin's opinion in Smith v. BAC Home Loans Servicing, 769 F. Supp. 2d 1033 (S.D.W. Va. 2011), which thoughtfully and thoroughly analyzes preemption issues in the wake of both Geier and Wyeth, is instructive here.  In Smith, a bank argued that federal banking law preempted a consumer's claims under West Virginia consumer credit law (relating to the foreclosure of her home).  Id. at 1037.  The bank's position was that because the claims "directly implicated" how the bank serviced the loans, they were preempted.  See id. at 1045.  In rejecting the bank's argument, Judge Goodwin explained that

8

"[o]bstacle preemption is not triggered merely because West Virginia's broad statute prohibiting unlawful forms of debt collection happens to ensnare certain practices of national banks."  Id. at 1046.  He further noted,

> In my view, forcing BAC to comply with the WVCCPA provisions identified in the Complaint will not stand as an obstacle to the significant regulatory objectives underlying the NBA and the relevant OCC regulations—allowing national banks and their operating subsidiaries to engage in mortgage servicing free from unduly burdensome state regulation.  It is not as if, by contrast, West Virginia has attempted to outlaw mortgage servicing as a whole or even sought to place any direct limits on the nature of that business.

Id.

Here, Robinson does not identify (with much precision) an important federal objective anchored in the text of federal law. Instead, Robinson says that Congress wanted uniformity and efficiency, citing several sources in support, including President Carter's signing statement for the Motor Carrier Act of 1980.[3]  A similar argument failed in Wyeth, where the defendant pointed not to some specific federal objective but to the FDA's balancing of competing objectives.  See 555 U.S. at 573.  The Court there also noted that the lack of an express preemption provision weighed against Congressional intent to

---

[3] It gives the court significant pause that the licensing requirements suggest a federal goal of free-market efficiency, if at all, only by reference to the larger deregulatory context provided by the Motor Carrier Act of 1980 in general.

displace state tort law with federal agency oversight.  Id. at 575.  Likewise, Robinson appears to argue that the federal licensing regime displaces the tort claims here because the licensing regime reflects the weighing of costs and benefits by an expert federal agency.  This balancing act, it suggests, sets a floor and a ceiling which must be respected lest the "system" be "disrupt[ed]."  (ECF No. 187, 19-20.)  As in Wyeth, this argument lacks merit.

In contrast with Robinson and with the defendant in Wyeth, the defendant in Geier successfully argued obstacle preemption by pointing to a very specific provision of a regulation:  one concerning whether airbags were mandatory.  See 529 U.S. 864-65. The regulation made it mandatory for manufacturers to put airbags in new vehicles, but only ten percent of them.  Id. at 879.  The Court concluded that in limiting its mandate to only ten percent, the federal regulation "deliberately sought a gradual phase-in of passive restraints," to allow more time for research and development, as well as public acceptance, and to produce a "mix" of safety devices in cars traveling U.S. roads. Id.  The regulation was also designed to make the adoption of state seatbelt laws more likely.  Id. at 881.  The regulation had a very extensive procedural history, which included a rejection of an all-airbag standard and reflected significant concern with public sentiment and public safety.  Id. at 878-89.

10

Beyond deriving from a very specific regulation, the federal interest itself in Geier was specific:  the maintenance of manufacturer choice in passive restraint systems to promote safety.  Id. at 886; Williamson v. Mazda Motor of Am., Inc., 562 U.S. 323, 330 (2011) ("In Geier, we found that the state law stood as an "'obstacle' to the accomplishment" of a significant federal regulatory objective, namely, the maintenance of manufacturer choice.").  The specificity in the federal interest there brought a concrete obstacle into focus.  Here, by contrast, the lack of specificity leads to an amorphous purported obstacle insufficient to disrupt West Virginia's historic police power.

Furthermore, the obstacle in Geier was more direct than here because state and federal safety standards were at odds.  A federal safety standard expressly did not mandate universal airbags, and a state tort claim would, in effect, mandate them retroactively.  This contrasts with the argument here, which is that a state tort claim should yield on preemption grounds to a federal licensing standard.  Although licensing and safety are related, it takes blurring the lines between them to fit this case into Geier's mold.

It is also important to note that Geier focused on a federal interest in safety, not economics.  Although the Court acknowledged that cost was a factor in the regulation, it did

not find the tort claim preempted simply because allowing it to proceed would upset a cost-benefit balance that a federal agency had struck.  Therefore, Geier does not stand for the proposition that an important federal objective arises whenever a federal agency has weighed safety and cost in coming up with a standard. Cf. Williamson, 562 U.S. at 335 ("But that fact—the fact that DOT made a negative judgment about cost-effectiveness—cannot by itself show that DOT sought to forbid common-law tort suits in which a judge or jury might reach a different conclusion.").

Beyond the lack of specificity in the purported important federal interests, there is the further problem that the tort claims here do not really stand in the way.  To the extent that uniformity and efficiency mean allowing the market to decide which carriers get business, the tort claims here do not defeat that purpose.  The negligent selection claim does not seek to impose additional licensing requirements on carriers or constrict brokers to choosing only carriers who meet additional licensing criteria.  All it does is impose liability for brokers that knew or should have known that a chosen carrier was incompetent or dangerous.  The vicarious liability claim is similarly not an obstacle.

The tort claims here derive from generally applicable background laws.  These laws are part of West Virginia's "historic police powers."  See Wyeth, 555 U.S. at 565.  Such is

the case here even more so here than in Smith, where the law at issue was one applicable merely to all debt collectors doing business in West Virginia.  See 769 F. Supp. 2d at 1046. Negligent selection and vicarious liability are background laws generally applicable to everyone doing business in West Virginia.  Cf. Nyswaner v. C.H. Robinson Worldwide Inc., 353 F. Supp. 3d 892, 895 (D. Ariz. 2019) ("Allowing Nyswaner's negligent hiring claim to proceed would not create a patchwork of state regulations as Robinson alleges.  Rather, it would only require that Robinson conform to the general duty of care when it hires trucking companies to deliver goods.").

In Smith, the court noted that the defendant bank would "remain free to engage in the federally regulated and sanctioned business of mortgage servicing."  769 F. Supp. 2d at 1046. Likewise, here, Robinson is free to continue its broker business and to continue selecting small carriers that it does not know (or should not know) are incompetent.[4]  As in Smith, where the court noted that the bank would remain free from the grasp of "unduly burdensome state regulation," so too here, state law is

---

[4] Robinson's position appears to be that negligent selection claims are always preempted when a carrier has operating authority because federal law intends that no further requirements be imposed for competency.  If this is so, it seems that a broker would be shielded against a negligent selection claim even if it selected a carrier knowing for certain that the carrier was incompetent or dangerous (despite its federal license).

not asking so much of Robinson here as to create an undue burden on its operations.  The duty to use reasonable care in selecting a carrier is not an onerous one.  Schramm v. Foster, 341 F. Supp. 2d 536, 551 (D. Md. 2004).

Finally, the argument that the state law here must yield to the federal interests of uniformity and efficiency largely ignores the important federal interest in the safety of the nation's roads.  It cannot reasonably be argued that requiring Robinson to use due care places anyone's safety in jeopardy. "To the contrary, imposing a common law duty upon third party logistics companies to use reasonable care in selecting carriers furthers the critical federal interest in protecting drivers and passengers on the nation's highways."  Id. at 552.

The lesson of Geier, Wyeth, and Smith is that an obstacle preemption defense requires specificity.  Pointing to general goals and saying that state law tends to hinder those goals is not enough.  See Soo Line R. Co. v. Werner Enterprises, 8 F. Supp. 3d 1130, 1134–35 (D. Minn. 2014), aff'd sub nom. Soo Line R.R. Co. v. Werner Enterprises, 825 F.3d 413 (8th Cir. 2016) ("For conflict preemption to apply, however, there must be 'far greater specificity' in the articulated conflict than a generalized notion of public safety.") (quoting Keller v. City of Fremont, 719 F.3d 931, 944 (8th Cir. 2013)).  Moreover, there is no obstacle even as to the general goals that Robinson

asserts.  The tort claims here are based on generally applicable background laws.  Obstacle preemption does not apply.

### b. Negligent Selection

The negligent selection claim will proceed because there are triable issues of fact as to this claim.  Plaintiffs do not need to establish an industry standard (and a breach thereof) to prove this claim.  Industry standards may be relevant to whether there was a breach of the standard of care, but the existence of a standard of care does not depend on the existence of an industry standard.  As to causation, plaintiffs need not establish it by a preponderance of the evidence at this juncture; all they must show is a triable issue of fact regarding causation.  Unlike with the vicarious liability claim, they have done so with the negligent selection claim.

### a. Standard of Care Argument

Robinson first argues that the negligent selection claim fails because plaintiffs' experts have not adequately established the existence a standard of care that requires anything more of Robinson than ensuring that the carriers it selects are federally registered.  Robinson suggests that, without such an industry standard, the standard of care necessarily does not require diligence beyond what it did here. Melding the concepts of a standard of care and an industry standard, Robinson concludes that this claim fails for lack of

an "industry standard of care."  (ECF No. 187, at 23.)  The premise of Robinson's argument is that, on these facts, the existence of an industry standard is indispensable to the existence of a standard of care.  Robinson fails to establish this premise; accordingly, its argument fails.

Robinson analogizes to cases in the deliberate intent context where the lack of an industry safety standard was a fatal flaw.  In the deliberate intent context, the violation of state or federal safety rule, or of a "commonly accepted and well-known" industry safety standard, is an element of the claim under West Virginia law.  See Stiltner v. Wal-Mart Stores, Inc., 2020 WL 4355066, at *3 (W. Va. July 30, 2020).  Robinson relies on a body of case law fleshing out what qualifies as an industry safety standard under West Virginia's deliberate intent statute to argue that plaintiffs have not established an industry standard here.  One problem is that the definition of an industry safety standard in that context is a unique creature of statute.  The second, more crucial problem is that the breach of an industry safety standard simply is not an element of a negligent hiring claim.[5]

_____

[5] Robinson is free to attempt to establish that the industry standard is not to look behind the carrier's registration.  It can seek to persuade the jury that its compliance with that industry standard made its conduct reasonable.  Compliance with an industry standard, however, is generally not dispositive.

### b. Causation Argument

Robinson's second argument—that any negligence in its selection of J&TS did not cause the collision—is more colorable. Robinson is correct that even if plaintiffs establish that J&TS (or Copeland) was utterly incompetent, there must be some causal connection between that incompetence and the collision. Robinson is incorrect, however, that the evidence fails to support a reasonable inference of causation.  Because plaintiffs have advanced sufficient evidence to make an inference of causation reasonable, they are entitled an opportunity to persuade a jury to make that inference.

West Virginia has recognized negligent selection as a cause of action and has expressly embraced § 411 of the Restatement (Second) of Torts.  <u>Sipple v. Starr</u>, 520 S.E.2d 884, 890-91 (W. Va. 1999).  Section 411 provides as follows:

> An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor
>
> (a)  to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or
>
> (b)  to perform any duty which the employer owes to third persons.

Restatement (Second) of Torts § 411 (1965).  Illustrations 3 and 4 to § 411 are key to Robinson's argument because, together, they draw a distinction between claims related to

17

characteristics of incompetence and claims unrelated to such characteristics.  See id.  Illustration 3 describes a collision where a driver mistakes the accelerator for the brake (liability under § 411), and Illustration 4 describes a collision where the driver is distracted because he was chatting with a passenger (no liability under § 411).  Id.

The rule, in other words, is that "before a plaintiff can succeed on a claim of negligent hiring of an incompetent independent contractor, he must prove not only that the contractor was incompetent and that the employer knew or should have known of that incompetence, but that the contractor's incompetence was a proximate cause of his injuries." Jones v. C.H. Robinson Worldwide, Inc., 558 F. Supp. 2d 630, 647 (W.D. Va. 2008).  On relatively similar facts, however, at least two courts have not required the plaintiffs there to establish, at the summary judgment stage, exactly how a particularized manifestation of incompetence caused the harm.  See Riley v. A.K. Logistics, Inc., 2017 WL 2501138, at *5 (E.D. Mo. June 9, 2017); Jones, 558 F. Supp. 2d at 648 ("While the court believes that the causation element is not particularly strong in this case, the court does find that the plaintiff has proffered evidence sufficient to withstand summary judgment.").

If the only reasonable inference on this record were that the collision was unrelated to J&TS's or Copeland's alleged

18

incompetence or habitual dangerous operations or driving, then summary judgment would most likely be appropriate.  But there is sufficient evidence of a causal connection such that the claim should proceed to trial.

This collision resulted when a tractor-trailer completely crossed a median into oncoming traffic.  Something went seriously wrong.  Copeland has said it was a brake failure (although there is evidence that this was not his original account).  Plaintiffs' experts say it was driver inattention, including inattention related to fatigue.  An eyewitness thought the maneuver into oncoming traffic was a controlled one.  If inattention did cause the collision, common sense suggests that the inattention was severe or that dangerous driving compounded it.  Momentary distractions certainly may, but do not tend to, send vehicles across medians into oncoming traffic.  It would not be unreasonable to infer that speeding, for which Copeland had been cited, compounded what may have otherwise been an innocuous attention lapse.  J&TS was aware that Copeland had been speeding while carrying its loads.  Plaintiffs' experts opine that Copeland's explanation of losing all power to the truck does not make sense.

Furthermore, there is evidence to ground a reasonable inference that Copeland, despite his experience, was less than competent, beyond his alleged propensity to speed.  Steven

Belyus opines that Copeland did not understand how his braking system worked or how to inspect it.  Lew Grill opines that Copeland displayed an incorrect understanding of how to control his speed.  Grill further opines that Copeland's poor driving "was not an isolated event, but rather was a pattern and practice of complete disregard of the rules, regulations and standards relative to professional drivers."  (See ECF No. 199, Ex. J, at 15.)  Robinson knew that Copeland would be the driver; he is listed on the contract addendum, and it may have been a breach of contract for J&TS to use a different driver.

On this record, a reasonable jury could find that J&TS was incompetent, hired an incompetent or habitually dangerous driver, and failed to supervise that driver properly.  A jury could further find that the driver, Copeland, caused the collision by driving in accordance with his alleged pattern of dangerous driving, or a combination of dangerous driving and inattention.  Such a finding may flow from a subsidiary finding that J&TS failed to enforce hours of service rules and that Copeland drove while fatigued, but it need not.  The evidence appears to support an inference of causation even without such a finding.  Further, it was foreseeable to Robinson that hiring a carrier with no experience would lead to that carrier's hiring a dangerous driver and to that carrier's facilitating dangerous driving, and ultimately, to a catastrophic collision.

### c. Vicarious Liability

The vicarious liability claim fails for insufficient evidence of Robinson's right to control the carrier or driver. Courts addressing this issue in similar cases have reached varied results, illustrating how a slight change in the facts could create a triable issue of fact.  But the court finds Schramm and Jones particularly persuasive and can discern no meaningful distinction between the relevant facts of those cases and this one, and no different outcome when applying West Virginia law to those facts.  Because there is no triable issue of fact as to vicarious liability on this record, the court will grant summary judgment as to this claim.

Under West Virginia law, determining "whether a master-servant relationship exists for purposes of the doctrine of respondeat superior" involves considering four factors:  "(1) Selection and engagement of the servant; (2) Payment of compensation; (3) Power of dismissal; and (4) Power of control." Paxton v. Crabtree, 400 S.E.2d 45, 248 (W. Va. 1990).  The fourth factor—power of control—"is determinative."  Id.  The independent contractor defense is "difficult to apply."  Sanders v. Georgia-Pacific Corp., 225 S.E.2d 218, 221 (W. Va. 1976).  On one hand, the defense is indisputably a fundamental limitation on tort liability.  See Zirkle v. Winkler, 585 S.E.2d 19, 22 (W. Va. 2003) (noting its "longstanding lineage").  On the other

hand, it is "riddled with numerous exceptions that limit its applicability" and render it a "slender reed." Shaffer v. Acme Limestone Co., 524 S.E.2d 688, 695 (W. Va. 1999).  Simply stating in a contract that a party is an independent contractor does not give the party that status.  Zirkle, 585 S.E.2d at 23.

"[T]he entity engaging an independent contractor is not required to surrender all control in order to maintain an independent contractor relationship." Cunningham v. Herbert J. Thomas Mem'l Hosp. Ass'n, 737 S.E.2d 270, 279 (W. Va. 2012).  As the Supreme Court of Appeals of West Virginia has explained,

> An owner who engages an independent contractor to perform a job for him or her may retain broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the contract—including the right to inspect, to stop the work, to make suggestions or recommendations as to the details of the work, or to prescribe alterations or deviations in the work—without changing the relationship from that of owner and independent contractor, or changing the duties arising from that relationship.

Shaffer, 524 S.E.2d at 693.

It may be true that the relevant control must be, in some sense, over the relevant (negligent) conduct.  See Anderson v. Tug River Coal & Coke Co., 53 S.E. 713, 715 (W. Va. 1906) (suggesting that question is whether there existed "the right to control, in the given particular, the conduct of the person doing the wrong" (emphasis added)).  But it is a mistake to view the relevant conduct too narrowly.  See Roof Serv. of

22

Bridgeport, Inc. v. Trent, 854 S.E.2d 302, 315 (W. Va. 2020).
West Virginia courts have not seen fit to do so.

The defendant in Trent argued that it was not vicariously
liable because it did not have control over how its employee
drove his personal vehicle when collecting scrap metal from a
company jobsite, off the clock.  See 854 S.E.2d at 315.  The
court rejected this framing of the relevant conduct, stating,

> As to the determinative issue of power of control, the
> focus on Mr. Wilfong operating his own vehicle is
> misplaced in that it fails to allow for the fact that
> the jobsite was controlled by Roof Service and, at any
> time, it could have exercised control by rescinding
> the permission to access it and collect the debris.

Id. at 315 (emphasis added).  Essentially, West Virginia law
appears to require a connection between what the principal has
the right to control and the negligent conduct of the agent, not
a perfect match between the two.

As mentioned above, two cases are particularly insightful
on the vicarious liability question here.  The first, Schramm,
involved a collision between a tractor-trailer and a passenger
vehicle resulting in catastrophic injuries.  341 F. Supp. 2d at
540.  Robinson was also the broker in that case.  Id.  The
plaintiffs there argued that several facts created a jury
question as to whether the broker had sufficient control over
the carrier.  Id. at 543.  First, the contract discussed
handling and inspection of the load and required that the

carrier report problems uncovered during inspection.  Id.
Further, Robinson dispatched the driver, "directed him to pick
up and deliver the load at specific times, and gave him
directions."  Id.  Robinson also required periodic calls from
the driver and gave the driver a number to call in the event
that a problem arose.  Id. at 543-45.

Unpersuaded, Judge Motz found that those facts were
insufficient to support a finding that the carrier was subject
to Robinson's control:

> There is no evidence that Robinson directed or
> authorized Foster to drive in excess of the maximum
> allowable hours or that Robinson had any control
> whatsoever the manner in which Foster conducted his
> work.  Robinson did not have the power to fire Foster
> or to control his activities in transit.  The only
> thing Robinson had a right to control was the ultimate
> result—the delivery of the load to its final
> destination in New Jersey.  The fact that Robinson
> instructed Foster on incidental details necessary to
> accomplish that goal is not enough to subject Robinson
> to liability for Foster's negligent acts during the
> course of the shipment when Robinson had no control
> over Foster's movements.

Id. at 546.

Robinson was also the broker in Jones.  There, the relevant
facts offered to show Robinson's control of the carrier included
that Robinson (1) required the driver to call in at dispatch,
delivery, and several points in between; (2) could terminate a
shipment at will; (3) facilitated advances and expedited
payments through a "T-Chek System" and "Quick Pay plan" (which

arguably increased the small carrier's financial dependence upon Robinson); and (4) could unilaterally terminate the shipment. Jones, 558 F. Supp. 2d at 637-38.  Additionally, drivers "called in to report any problems or issues that arose during the transport of the load, including equipment problems, traffic or delays, or needs for advances through Robinson's T-Chek System." Id. at 637.

Judge Conrad found that Robinson was an independent contractor as a matter of law:

> [H]ere Robinson did arrange pickup dates and times, provided pickup and delivery addresses to the carrier, communicated information from the shipper regarding the loading and unloading of cargo, provided other directions regarding the transportation of the load, and required drivers to call in to report the status of shipments.  However, all of these activities were directed toward the incidental details required to accomplish the ultimate purpose for which Robinson had been hired by its shippers—the delivery of a load to its proper destination in a timely fashion. Although Robinson could "bounce" a load from a particular carrier, it did so primarily when that carrier could not complete a delivery for whatever reason.  There is no evidence to indicate that Robinson could terminate a particular driver, or that it asked carriers to do so, or that Robinson controlled the details of the carrier's operations, such as its driver' schedules during a trip, particular routes, or compensation plans.  Furthermore, although AKJ may have received funds through Robinson's T-Chek system, the court finds that such advance payments on the carrier's fee do not indicate that Robinson exercised any heightened level of control over AKJ or its operations. Therefore, the court concludes that AKJ was an independent contractor of Robinson and that, as a result, Robinson cannot be held liable for the negligence of AKJ or its driver, Arciszewski, under a theory of respondeat superior.

Id. at 639.

Under West Virginia law and on similar facts, the same result obtains here.  Plaintiffs offer a laundry list of facts that they say are evidence of Robinson's right to control the carrier and driver.  Most are easily dismissed, including the fact that J&TS did not take jobs from other brokers; that plaintiffs' expert opines that the contract suggests control; and that the contract required J&TS to use a food-grade trailer, not mix shipments, and report damages or discrepancies.

A few facts, however, give the court pause.  First, Robinson required the driver to call them before and after pick-up, before and after delivery, and every morning throughout the trip.  The driver was also to call if he experienced problems along the way, and Robinson could contact him directly at any time.  J&TS was not permitted to contact the shipper.  Robinson was listed on the bill of lading as the carrier.  And Robinson tracked the load.  Finally, the contract addendum contains language possibly suggesting that Robinson may cut off the carrier for not completing the task in a certain way:  "Carrier acknowledges that failure to complete any terms and conditions on this shipment may jeopardize or result in loss of future business opportunities with C.H. Robinson and/or cancellation of

the C.H. Robinson carrier contract." (See ECF No. 199, Ex. M, 4.)

As to the driver calls, Robinson says it was just wanted to know about possible delays. It was already tracking the shipment, however, so requiring the driver to call in every day seems excessive. Together with the threat of loss of future business for untimely deliveries, these daily calls could conceivably open the door for Robinson to exert pressure on drivers to drive faster. If there were some evidence that Robinson had used the daily calls to pressure drivers in the past, there would likely be a jury question on vicarious liability. As it is, the facts concerning communications between the driver and Robinson are virtually the same here as they were in Schramm and Jones. And the court is convinced that, although it is close, these facts are insufficient to support a reasonable inference of Robinson's right to control the carrier or driver.

The fact that Robinson prohibited the carrier's contact with the shipper and that Robinson was listed as the carrier speak to the blurring of the lines between broker and carrier. Robinson obviously does more than simply connect shippers and carriers and then walk away. Robinson appears to do everything except physically move the goods to be shipped. Some shippers may reasonably be confused as to who the shipper actually is.

27

The blurring of the lines favors a finding of agency.  In cases where there really is no distinction between broker and shipper, control may be a reasonable inference.  Here, though, there is enough of a distinction to make the blurring, by itself, insufficient.  On slightly different facts, the result may be different.

## IV.  <u>Conclusion</u>

For the foregoing reasons, Robinson's motion for summary judgment is **GRANTED** in part and **DENIED** in part.  It is granted only as to plaintiffs' vicarious liability claim.  Because plaintiffs have withdrawn their punitive damages claim, the portion of Robinson's motion seeking summary judgment on that claim and Copeland's motion for summary judgment (ECF No. 184) are **DENIED** as moot.  Plaintiffs' motion to exceed the page limit (ECF No. 196) and defendant's motions to exceed the page limit (ECF No. 181, 204) are **GRANTED.**  Robinson's motion for leave to file a supplemental memorandum (ECF No. 288) is **DENIED** for lack of good cause.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record.

**IT IS SO ORDERED** this 26th day of August, 2021.

ENTER:

_David A. Faber_

David A. Faber
Senior United States District Judge