IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

Clinton Eugene Gilley, as Administrator
of the Estate of CARL DAVID GILLEY,
Nicole Leigh Le, as Administrator of the
Estate of CHRISTINE TARA WARDEN GILLEY,
and Clinton Eugene Gilley and Nicole
Leigh Le as Co-Administrators of the
Estates of J.G. and G.G., minor children,

     Plaintiffs,

v.                                    CIVIL ACTION NO. 1:18-00536

C.H. ROBINSON WORLDWIDE, INC.,
J&TS TRANSPORT EXPRESS, INC.,
and BERTRAM COPELAND,

     Defendants.

## MEMORANDUM OPINION AND ORDER

Several motions relating to proposed expert testimony are pending before the court.  The first is the motion of defendant C.H. Robinson ("Robinson") to exclude the opinions of plaintiffs' experts Lew Grill, Steven Belyus, and Thomas Corsi. (ECF No. 206.)  The second is plaintiffs' motion to exclude the causation opinion of Thomas Lyden.  (ECF No. 208.)  That motion also asks the court to go further and exclude the defense theory that the lack of a median barrier caused the collision.  The third and fourth motions are defendant Bertram Copeland's motions to exclude, respectively, certain testimony of Lew Grill (ECF No. 210) and certain testimony of Steven Belyus (ECF No.

211).  For the reasons that follow, the court **DENIES** Robinson's motion (ECF No. 206); **GRANTS** plaintiffs' motion (ECF No. 208) in part; and **DENIES** Copeland's motions (ECF Nos. 210 and 211), subject to the renewal of Copeland's objections should Grill or Belyus step outside the boundaries set forth below.

I.   **The Parties' Experts**

   **a. Thomas Corsi**

For the past forty-five years, Thomas Corsi, Ph.D. has served on the faculty of the University of Maryland, where he is currently a professor of logistics and a co-director of the Supply Chain Management Center at the Robert H. Smith School of Business.  He has authored or co-authored more than one hundred articles and four books on logistics and transportation.  He has served as a consultant both in the private sector as well as for several public agencies tasked with transportation-related missions.  His history of advising the U.S. Department of Transportation on carrier safety issues goes back over forty years.  There is no doubt that his qualifications are "extensive."  See Mann v. C. H. Robinson Worldwide, Inc., 2017 WL 3191516, at *14 (W.D. Va. July 27, 2017).

   **b. Thomas Lyden**

Thomas Lyden is a civil engineer with considerable experience in the field of transportation, including twenty-five years with the Ohio Department of Transportation, where he

worked on issues relating to median barriers.  He has a
bachelor's degree in Civil Engineering from the University of
Cincinnati and an MBA from The Ohio State University.  While his
civil engineering background is impressive, his credentials do
not appear to extend to accident reconstruction or biomechanical
engineering.

### c. Lew Grill

Lew Grill has over half a century of experience in the
trucking industry that spans from the driver's seat to the
instructor's lectern and beyond.  He has personally logged more
than two million miles in national and international truck
driving.  He is licensed for loads of extreme weight and
dimensions and is certified to inspect and repair air brakes.
More than a dozen instructional safety video productions have
drawn upon his expertise, and he can claim authorship of
hundreds of articles, as well as fifteen books, on trucking,
truck driving, and heavy equipment operation.  His current
research project is investigating the relationship between
foreign driving cultures and domestic truck collisions.

### d. Steven Belyus

Prior to becoming a consultant on matters such as accident
reconstruction, fleet inspection, and transportation safety,
Steven Belyus had a 27-year career with the Ohio Department of
Public Safety, where he served as a highway patrol officer,

3

accident reconstructionist, and commercial enforcement coordinator.  There is no dispute as to his expertise in the area of accident reconstruction.

## II.  **Legal Standard**

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

"Essentially, the witness must be qualified as an expert, the testimony must be reliable, and the testimony must assist the trier of fact."  In re Fosamax Prod. Liab. Litig., 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009).[1]

---

[1] In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court listed four factors that may guide the reliability analysis.  See 509 U.S. 579, 593-94.  "[T]he four-factor mold set forth by Daubert that governs scientific expert opinions," does not necessarily apply to non-scientific expert opinions. See In re Mirena IUD Prod. Liab. Litig., 169 F. Supp. 3d 396, 480 (S.D.N.Y. 2016).

Rule 702 requires courts to stop proffered expert opinions at the gate if they lack reliable foundation or relevance "to the task at hand." McKiver v. Murphy-Brown, LLC, 980 F.3d 937, 959 (4th Cir. 2020). Because "the adversary system" awaits such opinion evidence on the other side of the gate, the gatekeeping function is a limited one. See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. 892 F.3d 624, 631 (4th Cir. 2018). Beyond the gate are credibility determinations, which are reserved for the trier of fact; before the gate are reliability and relevancy determinations, which are the province of the gatekeeper. Sardis v. Overhead Door Corp., ___ F.3d ___, 2021 WL 3699753, at *7 (4th Cir. Aug. 20, 2021) ("[C]redibility is entirely distinct from reliability and relevancy, which are *preconditions* to the admissibility of expert testimony.") (emphasis in original).

Factors that may guide the court in its fulfillment of its gatekeeping role are as follows:

> (1) whether the particular scientific theory can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the "existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community.

United States v. Crisp, 324 F.3d 261, 265-66 (4th Cir. 2003)

(citations and internal quotation marks omitted).  This list is

illustrative, not definitive or exhaustive.  Id.

The reliability of the methodology, not the correctness of

the conclusion, is the focus of inquiry.  See Pugh v. Louisville

Ladder, Inc., 361 F. App'x 448, 452 (4th Cir. 2010).

> [D]istrict courts must ensure that an expert's opinion
> is based on scientific, technical, or other
> specialized *knowledge* and not on belief or
> speculation.  And to the extent an expert makes
> inferences based on the facts presented to him, the
> court must ensure that those inferences were derived
> using scientific or other valid methods.

Sardis, 2021 WL 3699753, at *6 (emphasis in original) (citations

and internal quotation marks omitted).

Helpfulness to the trier of fact is the "touchstone" of

Rule 702.  Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993).

The party proffering the expert's opinion has the burden of

production on the question of admissibility.  Maryland Cas. Co.

v. Therm-O-Disc, Inc., 137 F.3d 780, 783 (4th Cir. 1998).

## III. Discussion

### a. Robinson's Motion

As originally framed, Robinson's motion asked the court to

exclude all or part of the expected testimony of three expert

witnesses whom plaintiffs have named:  Thomas Corsi, Steven

Belyus, and Lew Grill.  The briefing has narrowed the issues as

originally framed such that, according to Robinson, "the only

question currently presented for the Court's consideration" is whether "Dr. [Thomas] Corsi's two opinions against Robinson [should] be excluded from trial as unreliable and unsupported." (ECF No. 228, at 2-3.)[2]

These two opinions are really one opinion:  that brokers deciding whether to hire certain carriers must either (1) decline to hire them or (2) engage in some sort of vetting of them beyond checking their federal registration and insurance policy first.[3]  Robinson finds Corsi's opinion objectionable because it does not describe the prevailing practice across the freight brokerage industry; instead, it describes what Corsi believes some brokers do and what Corsi, based on his expertise, believes brokers must do to avoid hiring incompetent carriers. Robinson further argues that the opinion is too vague and that the methodology is undisciplined for making use of internet information that may be outdated in some instances.  Finally, Robinson disputes the efficacy of vetting carriers in the manner Corsi prescribes.

---

[2] In substantial part, the narrowing is the result of plaintiffs' representation in their opposition that neither Belyus nor Grill will offer testimony about the broker industry.  Because plaintiffs have waived such testimony as to these experts, the portion of Robinson's motion concerning Belyus and Grill is moot.

[3] Corsi offers other opinions that are not at issue in this motion.

Corsi will be allowed to testify as to what he believes
some brokers do (or have done in the past) and what he believes
brokers must do when deciding whether to hire new-entrant
carriers.  The Supreme Court has been clear that a district
court may tailor its reliability analysis to the proffered
opinion at hand.  Doing so here, the court finds that the
opinion suffers from no reliability infirmity.

The real issue not whether Corsi's opinion here is
reliable, but whether it is helpful.  More specifically:  Does
the opinion as to what a broker must do to select competent
carriers offer impermissible legal commentary?  The answer lies
in the different uses of the term "standard of care."  As the
court understands it, Corsi will not prescribe a legal duty.
Instead, he will explain what precautions are necessary and
appropriate, and the jury can choose whether to adopt those
precautions as necessary to Robinson's fulfillment of its duty
of care.  Robinson's expert will provide an opinion on the same
subject.  Both experts will be subject to cross-examination.
The jury will reach its own conclusion as to whether the failure
to take certain precautions was negligent.

### 1. Robinson's Industry Standard Contention

As Robinson frames the issue, Corsi should not be allowed
to testify as to what he believes a broker must do when deciding
whether to hire a new-entrant carrier because Corsi cannot show

that such a course of action is widely followed in the industry. Robinson makes the threshold proposition that a standard of care does not exist unless the relevant industry has accepted it. The case law upon which Robinson relies, however, is almost entirely from the context of actions under West Virginia's deliberate intent statute.  Robinson erroneously attempts to import requirements from that context into this one.

For example, Robinson cites <u>Handley v. Union Carbide Corp.</u>, 804 F.2d 265 (4th Cir. 1986).  There, the Fourth Circuit Court of Appeals interpreted a prior version of West Virginia's deliberate intent statute, which required plaintiffs to prove "a violation of a state or federal safety statute, rule or regulation, whether cited or not, <u>or of a commonly accepted and well-known safety standard within the industry</u>."  <u>Id.</u> at 270 (emphasis added).  The appeals court noted that "[i]t would be rare that a 'commonly accepted and well-known' safety standard could be established by showing that it exists in only one facility."  <u>Id.</u> at 273.

Robinson appears to suggest that the requirements for a <u>safety standard</u> under West Virginia's deliberate intent statute apply equally to the existence and contours of a <u>standard of care</u> in a negligence case under West Virginia common law.  The

court is puzzled as to why this would be so.[4]  Robinson's approach appears to conflate the concepts of standards of care and industry standards, effectively requiring that any negligence claim against an industry actor involve the breach of a common practice in the industry.  West Virginia's high court has rejected the idea that industry custom dictates the standard of care applicable to a given industry.  See Smoot ex rel. Smoot v. Am. Elec. Power, 671 S.E.2d 740, 745 (W. Va. 2008); Bates v. Sirk, 230 S.E.2d 738, 741 (W. Va. 1976).

In sum, a standard of care is not the same as an industry standard, nor is it the same as a commonly accepted and well known safety standard in the deliberate intent context.  Robinson's threshold argument that a standard of care cannot be established unless it is widely accepted in the industry, therefore, fails.

---

[4] Robinson also cites Good v. Am. Water Works Co., No. CV 2:14-01374, 2016 WL 6024426, at *2 (S.D.W. Va. Oct. 13, 2016); Coe v. Outback Steakhouse of Fla., LLC, 2013 WL 140107, at *1 (N.D.W. Va. Jan. 10, 2013); and Hoschar v. Appalachian Power Co., 906 F. Supp. 2d 560, 570 (S.D.W. Va. 2012), aff'd, 739 F.3d 163 (4th Cir. 2014).  All but Good feature the deliberate intent context and, accordingly, require no further discussion.  Good was about whether a certain initiative called Responsible Care constituted an industry standard, not about what a reasonable industry actor would do.  2016 WL 6024426, at *7.  ("Second, the parties dispute whether Responsible Care is an industry standard and, if so, whether Eastman's conduct comported with its requirements. The court concludes that the record lacks competent evidence to establish that Responsible Care represents the industry standard.") (emphasis added).

**2. Robinson's Reliability Contention**

Robinson argues that Corsi's opinion is the product of unreliable methodology.  In his report, Corsi provides a list of brokers that will not hire new entrants and a list that will conduct investigation beyond verifying new entrants' federal registration and insurance policy.  Robinson says that, to compile this list, Corsi relied on his own published paper, which, in turn, relied on reviews of brokers' websites. Robinson further says that the lists are outdated or inaccurate, which illustrates the unsoundness of the methodology.

The court disagrees that Corsi's methodology is unsound. Had Corsi used internet searches to establish a scientific theory, there would probably be a reliability problem.  Here, however, Corsi used the searches to catalogue practices in the industry.  While the list may be outdated in some of its particulars, that goes to weight, not admissibility.  In performing its gatekeeping role, the court should limit its analysis to those Daubert factors that are pertinent to a given expert opinion.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 138 (1999) (explaining that the Daubert factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony").

11

Corsi was not formulating theories; he was making lists. He relied on information from a published paper.  Moreover, even if the information on the lists is inaccurate, Corsi may still testify about what he believes brokers must do because a universal omission by industry actors can still be negligent if due care requires it.

### 3. Robinson's Efficacy Contention

Robinson argues that Corsi's opinion should be excluded because it proposes a vetting process that unrealistically "depends on the veracity of the motor carrier who is responding to the broker's questions."  (ECF No. 207, at 9.)  This contention goes to weight, not admissibility.  Robinson is free to argue that taking the precaution Corsi proposes would not have resulted in a different outcome here.

### 4. Whether Corsi Provides a Legal Conclusion

Although Robinson did not raise it explicitly, one issue that gave the court pause was whether Corsi's opinion states a legal conclusion by attempting to define Robinson's legal duty. That, of course, is the court's role.  One court has rightly noted that "distinguishing between admissible testimony regarding the standard of care and inadmissible testimony on legal conclusions is often a fine line."  Howard v. Offshore Liftboats, LLC, 2016 WL 232238, at *3 (E.D. La. Jan. 19, 2016).

Two different senses of the term "standard of care" mark the line between permissible and impermissible testimony here, and Corsi appears to be on the right side of the line.  Corsi does not attempt to articulate the overarching legal duty to which Robinson's conduct needed to conform.  Instead, he attempts to answer the more fact-bound question of what precautions are necessary for brokers to select competent carriers.  Corsi's opinion will help the jury reach its overall determination as to whether Robinson was negligent by allowing the jury, should it so choose, to identify the untaken precaution undergirding plaintiffs' theory of the case.  It will not simply tell the jury what the law is or what the outcome should be.  His opinion is more factual than legal and is permissible.

"The facts of every case will determine whether expert testimony would assist the jury."  Kopf v. Skyrm, 993 F.2d 374, 379 (4th Cir. 1993).  Generally, an expert's mere legal conclusion is unlikely to be helpful.  See United States v. Barile, 286 F.3d 749, 760 (4th Cir. 2002).  But a case involving a specialized industry may present an exception to this general rule.  See id. at 760 n.7.  Determining whether a question "calls for an improper legal conclusion" involves considering "first whether the question tracks the language of the legal principle at issue or of the applicable statute, and second,

13

whether any terms employed have specialized legal meaning." Id. at 760.  Expert opinions constituting legal conclusions are not to be confused with expert opinions on ultimate issues, although the task of avoiding such confusion "is not an easy one." Id.

Determining whether Corsi states a legal conclusion involves recognizing that courts and lawyers use the term "standard of care" in multiple ways.  They sometimes use the term to describe an overarching legal duty. See, e.g., Curl v. Pettway, 2009 WL 10731087, at *2 (E.D. Va. Dec. 1, 2009) (analyzing the "legal question" of the appropriate "standard of care").  In a negligence case, that generalized duty may be described as "what a reasonable, prudent person would do under the circumstances." Id.  In a medical malpractice case, it may be stated as the "exercise [of] that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances." Nottingham v. United States, 2017 WL 3026926, at *3 (S.D.W. Va. July 17, 2017).  To the extent that an expert attempts to prescribe a standard of care in this sense of the term (an overarching legal duty), such attempt is usually impermissible.

Alternatively, "standard of care" is used to describe not an overarching duty, but instead, what the fulfillment of that

14

duty looks like.  Though provided in a different context, an explanation on this point by Judge Sykes is very helpful:

> Colleges must provide students with a safe living environment as part of their generalized duty of care, but what are the contours of that duty in a given case?  More specifically, what security measures must a particular college undertake to provide a level of safety that is reasonable under the circumstances? That question—what specific actions did Carthage need to take to meet its generalized duty of care—is what the term "standard of care" addresses in this context, and that is the question the expert's testimony must address.  In a sense, in this context the standard of care is a fusion of the elements of duty and breach: The security measures that were reasonable under the circumstances make up the duty of care, and to the extent that Carthage's actions fell below this standard, it breached that duty.

Lees v. Carthage Coll., 714 F.3d 516, 523 (7th Cir. 2013) (emphasis added).

It is in this second sense of the term that Corsi appears to offer commentary on the "standard of care."  He describes the precautions that be believes, based on his expertise, are necessary for brokers to select competent carriers.  He says that if a broker is going to hire a new entrant it cannot do so safely without vetting the carrier using such means, at minimum, as a safety questionnaire.  In part, he draws upon his research indicating that some industry actors have refused to hire new-entrant carriers or have vetted them using such methods as a questionnaire before hiring them.

But Corsi need not rely exclusively on what the industry has done or is doing.  Because West Virginia law does not allow industry custom to dictate the extent of the care that is due, Corsi could offer the challenged opinion even if no other industry actor were doing what his expertise compels him to conclude must be done.  In offering his opinion, he presumably draws in large part upon his significant research on the higher safety risks that new entrants bring to others on the road, as well as his experience evaluating transportation risks over the past several decades.  His opinion may inform the jury's decision as to whether there was a breach.  The opinion will be helpful because the brokerage industry likely presents a context beyond the ken of most jurors.  The opinion usurps neither the role of the court to instruct the jury on Robinson's legal duty nor the role of the jury to determine whether there was a breach thereof.

Notably, other federal courts have not discerned a problem with Corsi providing standard of care opinions.  See, e.g., Mann v. C. H. Robinson Worldwide, Inc., 2017 WL 3191516, at *14 (W.D. Va. July 27, 2017) ("The court . . . will allow Corsi to testify about a broker's reasonable standard of care in 2014."); Riley v. A.K. Logistics, Inc., 2017 WL 2501138, at *13 (E.D. Mo. June 9, 2017) ("Ultimately, C.H. Robinson's objections go to the weight Dr. Corsi's opinion should be given, not whether it is

16

admissible; and it is for the jury to determine whether to agree with Dr. Corsi's proposed standard of care."). And "courts routinely view expert testimony regarding the standard of care applicable in a trucking accident case . . . not as an impermissible legal conclusion but, rather, as admissible if reliable and otherwise relevant." Stiefel v. Malone, 2021 WL 426217, at *9 (N.D. Ala. Feb. 8, 2021).

The court will allow Corsi to provide the challenged opinion and his other opinions that are relevant.[5]  At trial, however, Robinson's counsel is free to object if Corsi appears to cross the line into impermissible legal conclusions.

### b. Plaintiffs' Motion

Plaintiffs move to exclude Thomas Lyden's opinion that a median barrier would have changed the outcome of the collision. They say that the opinion is not the product of reliable methodology. The court agrees. The focus of Lyden's report is on whether there was a breach by the West Virginia agencies ostensibly responsible for installing barriers. Assuming Lyden has the expertise to opine on the separate, causation question of whether a barrier would have changed the trajectory of the

---

[5] The court having granted summary judgment in Robinson's favor as to the vicarious liability claim, Corsi's opinions regarding Robinson's purported control of the carrier and driver are irrelevant.  The court need not reach Robinson's contention that these opinions state legal conclusions.

fully loaded truck, he did not bring that expertise to bear as
to the specific facts of this case.  It is not apparent that he
even considered the particular variables that must inform the
causation opinion, let alone conducted tests based on those
variables.  The methodology (or lack thereof) does not pass
muster under Rule 702.

The two iterations of the challenged opinion are as
follows:

1. The installation of a median barrier, whether it is cable,
   concrete, or beam guardrail, by the West Virginia Turnpike
   Authority at the time and location of the incident would
   have prevented or changed the outcome of the cross-median
   incident between Mr. Copeland and the Gilley-Family.

2. The failure of the West Virginia Turnpike Authority to
   install [a] median barrier, which is a proven safety
   countermeasure to address the pattern of crossover and
   median overturn/rollover crashes, within a reasonable
   period of time from when they knew or should have known
   there was a safety issue at the incident location, was a
   violation of the standards of care and would have prevented
   or changed the outcome of the crossover incident between
   Mr. Copeland and the Gilley-Family.

While theories regarding engineering matters need not be
proven to be admissible, they generally must be tested in some
way; naked hypotheses will not do.  See Nease v. Ford Motor Co.,
848 F.3d 219, 232 (4th Cir. 2017).  The question of "how an
object will perform when subjected to certain forces" is
scientific in nature.  Sardis, 2021 WL 3699753, at *14.  It
raises "basic, testable engineering concepts," and an opinion on

this question ought to be tested before presented to a jury.
See id.

Lyden did not test the hypothesis that a barrier would have
changed the outcome.  In fact, his report does not even show
that he considered the particular variables presented by the
facts here that would determine whether the force of a given
barrier would have sufficiently withstood the force of the
truck.  There is no methodology other than saying that studies
show that barriers tend to be effective, so a barrier would have
been effective here.  If the question were the effectiveness of
barriers as a general matter, the methodology could be reliable.
But the question is more specific:  whether, given the
particular facts of this case, the lack of a barrier caused the
deaths of plaintiffs' decedents.[6]  As to that specific question,
the court cannot discern the presence of a reliable methodology.

The studies about the effectiveness of median barriers that
Lyden reviewed are presumably reliable materials for experts in
his field.  But his opinion cannot merely apply general studies
to specific facts without analysis.  Extrapolating from the
studies to this particular set of facts requires inferences.  In
this situation, those inferences require testing.  Even assuming

---

[6] To be relevant, the opinion need not show that the accident
would have been avoided entirely.  Presumably, if the presence
of a barrier would have resulted in injury but not death, the
opinion would be relevant for purposes of nonparty fault.

that testing were not required, however, Lyden would need to
explain how he reliably applied his experience to his
conclusion.  See Fed. R. Evid. 702 advisory committee's note to
2000 amendments ("If the witness is relying solely or primarily
on experience, then the witness must explain how that experience
leads to the conclusion reached, why that experience is a
sufficient basis for the opinion, and how that experience is
reliably applied to the facts.").  There is no such explanation
here.

Robinson contends that Lyden's causation opinion is,
ultimately, a modest one:  that "a guardrail would have made a
difference."  (ECF No. 226, at 10.)  But that opinion requires
the application of basic, testable engineering concepts.
Moreover, it is hard to tell whether the opinion is truly modest
because both iterations of it are overly general.  The first one
does not specify which kind of barrier would have "prevented"
and which would have merely "changed" the outcome.  Presumably,
"preventing" the "outcome" means preventing the collision, but
that too is not entirely clear.  There are no details as to what
a "changed" outcome would look like.  The second iteration
removes the types of barriers and adds that barriers are "proven
safety countermeasure[s]."

Ultimately, the second iteration of the opinion helps
reveal why it is unreliable.  By stressing that medians are

"proven," it implies that no individual testing or analysis is required.  Because the law of this circuit is to the contrary, the court cannot allow the challenged opinion.

Having excluded the challenged opinion, the question becomes whether Robinson's theory of fault against the West Virginia agencies should be disallowed.  Plaintiffs say that excluding the opinion leaves Robinson unable to prove causation against the West Virginia agencies, and as a consequence, Robinson should not be allowed to proceed on this theory. Specifically, plaintiffs ask that the court preclude any argument or evidence that certain West Virginia agencies were at fault for not installing a barrier and to rule that those agencies shall not be listed on the jury verdict form.[7]

While there does appear to be a dearth of evidence as to causation, the court will exercise its discretion to defer judgment on this issue until the evidence is in.  Cf. Lutz v. Est. of Hillier, 574 F. Supp. 1032, 1034 (S.D.W. Va. 1983) (Haden, C.J.) (declining to enter summary judgment in medical malpractice case where plaintiff could theoretically establish standard of care by calling defendant's expert as an adverse witness).  Once Robinson is fully heard on the issue, plaintiffs

---

[7] The West Virginia Department of Transportation, the West Virginia Division of Highways, and the West Virginia Parkways Authority ("West Virginia Agencies") are named in a notice of nonparty fault by Robinson pursuant to W.Va. Code § 55-7-13D.

may move for judgment as a matter of law on the issue of fault of the West Virginia Agencies, incorporating by reference the arguments made in their motion in limine and any further arguments they may care to make at that time.

### c. Copeland's Motions

Copeland has filed two motions asking the court to exclude portions of expected expert testimony.  One concerns Grill, and the other concerns Belyus.  Plaintiffs' opposition has narrowed the issues by voluntarily limiting the opinions of their experts.  As to portions remaining in dispute, the court will not exclude the opinions but will provide boundaries as to their appropriate extent.

### 1. Lew Grill's Opinions

Copeland asks the court to exclude Grill's opinions (1) that Copeland operated the tractor-trailer below the standard of care for truck drivers, including by failing to comply with the standards outlined in the CDL Manual and the Federal Motor Carrier Safety Regulations; (2) that Copeland failed to use reasonable care; (3) that Copeland is responsible for the collision; (4) that Copeland is held to a higher standard of care; (5) that Copeland had a pattern and practice of violating regulations and standards for professional drivers; and (6) that

fatigue was a cause of the collision.[8]  Copeland argues that several of these opinions state legal conclusions or invade the province of the jury.  Copeland further argues that Grill's opinion regarding a pattern and practice of violations is vague and unsupported and that Grill's opinion regarding Copeland's failure to follow safe trucking standards is unsupported.  Finally, Copeland argues that Grill's fatigue opinion should be excluded as untimely and because the methodology behind it is unsound.

As to legal conclusions and ultimate issues, the court finds that Copeland's argument has some merit but sweeps too broadly.  The court will provide guidance below as to when Grill may cross the line, and Copeland may object at trial if he feels the line has been or will be crossed.  As to the pattern and practice of violations, this is a disputed characterization of fact best handled through cross-examination.  Grill appears to have a basis for it, and the jury can decide whether it is an exaggeration or accurate description.  As to opinion regarding not following safe trucking standards, there likewise appears to be a sufficient basis for it.  Finally, the court overrules

---

[8] Copeland also challenged Grill's opinions that Copeland was negligent and that he did not have a Commercial Driver's License.  Plaintiffs have represented that they do not plan to elicit such testimony from Grill, so that portion of the motion is moot.

Copeland's objection to the untimeliness of the fatigue opinion
for the reasons stated in its memorandum opinion on Robinson's
motion to strike the opinion, (see ECF No. 257), and rejects the
argument that the fatigue opinion is unreliable.

### A. The Standard of Care and Reasonable Care Opinions

The first and second opinions are helpful and admissible
insofar as Grill seeks to explain how he believes Copeland's
specific acts were contrary to industry standards or contrary to
what reasonable care would require of a truck driver under the
circumstances.  "Federal courts in our circuit . . . have
suggested that commercial truck driving standards are often
technical but that the answer depends on the specific facts and
circumstances."  Benedict v. Hankook Tire Co., 286 F. Supp. 3d
785, 792 (E.D. Va. 2018).  The specific facts and circumstances
here are disputed.  They involve alleged mechanical failures and
alleged hours-of-service violations.  Undisputedly, however, the
circumstances involve procedures for navigating a fully loaded
truck down a somewhat steep grade on the West Virginia Turnpike.
The court finds that there is sufficient complexity such that
expert testimony about commercial truck driving standards will
be helpful to the jury.

Relatedly, Grill may opine that Copeland was in breach of
industry standards because industry standards are merely
informative of the overarching legal duty under West Virginia

24

law.  The jury can choose to credit or discredit Grill's opinion as to specific purported breaches of the standard of care or of industry standards when reaching its overall determination of whether Copeland was negligent.

The opinions are unhelpful and inadmissible insofar as Grill may attempt to label Copeland's conduct unreasonable in general or to say that he generally failed to exercise due care; essentially, that would be an unhelpful opinion that Copeland was negligent.[9]

Copeland challenges Grill's opinions that Copeland violated certain trucking standards as circular and unsupported.  He says that Grill concludes that the violations caused the collision, but that the only evidence of the violations he relies upon is the fact of the collision.  The court disagrees.  In part, Grill reached this opinion by ruling out other causes.  His report considers Copeland's explanation that he lost power to the truck improbable and states that, even if Copeland had lost power, he would not have lost the ability to steer.  In essence, Grill rules out the possibility that a mechanical failure made the collision unavoidable.  Grill is expected to opine that Copeland

_____

[9] "The Court can, and will, resolve any lingering concerns about 'ultimate issues for the jury' by instructing the jury that they are ultimately to make the decisions concerning causation and negligence."  Ricker v. Southwind Trucking, Inc., 2006 WL 5157692, at *8 (N.D. Ga. July 13, 2006).

crossed the median due to inattention, including fatigue-induced
inattention.  Grill's opinions that Copeland was not complying
with trucking safety standards requiring alertness naturally
flow from his opinion that Copeland was not paying attention.

**B. The Responsibility Opinion**

The third opinion, regarding Copeland's responsibility for
the collision, is helpful and admissible insofar as Grill seeks
to explain what he believes caused Copeland to cross the median
and collide with plaintiffs' decedents.  Grill can testify as to
what he believes Copeland did to cause a collision.

The opinion is unhelpful and inadmissible insofar as Grill
may seek to state the Copeland is legally or morally responsible
for the collision or seeks to state, in a merely conclusory
fashion, that Copeland caused the collision.

**C. The Heightened Standard of Care Opinion**

The fourth opinion, regarding the standard of care, is
helpful and admissible insofar as Grill seeks to explain why the
risks associated with driving large commercial vehicles are
greater than for other vehicles and how commercial drivers must
take that reality into account in how they operate their
vehicles.

The opinion is unhelpful and inadmissible insofar as Grill
may seek to state an overarching legal standard of care or state

that the <u>legal</u> expectations of commercial drivers are higher
than of other drivers.

### D. The Pattern and Practice Opinion

The fifth opinion, regarded Copeland's purported pattern
and practice of violations, appears to be based largely on the
official post-crash compliance review.  Assuming experts in
Grill's field reasonably rely on such reports, there appears to
be a sound basis for the opinion.  Grill can interpret the
findings from that report to mean, based on his expertise, that
Copeland was an unsafe driver.  This is not for the
impermissible purpose of showing propensity to drive
dangerously, but to show notice to the carrier or broker that
the driver was a potential hazard to others on the road.  It
also may show that the carrier was incompetent in its hiring and
supervision.

### E. The Fatigue Opinion

As to the sixth opinion, regarding driver fatigue, the
court incorporates its reasoning in ECF No. 257 in rejecting the
untimeliness argument.

The court also rejects the argument that the fatigue
opinion fails for lack of a reliable methodology or lack of "any
degree of certainty."  (<u>See</u> ECF No. 210, at 7.)  While it is
true that Grill did not employ his usual method in performing
the hours-of-service calculation, and while the usual method

27

arguably yields better results, the method that Grill employed appears to be sound under Rule 702.  He did not employ the usual method because certain data was unavailable in this case.  He relied on the data he had, which was the Teletrac data.  Based on the parties' experts' competing analyses as to how to interpret the Teletrac data, the jury will resolve the factual disputes as to whether Copeland had violated hours-of-service regulations in the relevant time period and whether, regardless of any such violation, fatigue was a factor in the collision.

**2. Steven Belyus's Challenged Opinions**

Copeland asks the court to exclude Belyus's opinion that the cause of the collision was Copeland's inattention.[10] Copeland says that the opinion is speculative and is not the product of reliable methodology.  Copeland does not appear to challenge Belyus's methodology in ruling out other potential causes of the collision.  Rather, he appears to suggest that the inference resulting from that process of elimination is more properly for the jury to make.

Belyus's opinion is admissible.  Defendants concede that Belyus is an expert accident reconstructionist.  His driver inattention opinion rests on more than speculation.  There is

---

[10] Plaintiffs having withdrawn Belyus's supplemental report, Copeland's challenge as to the opinions in only that report are moot.

ample evidence to support his inference of driver inattention, such as his observations regarding the lack of friction marks and the angle of the truck's entry into the median.  His opinion will be helpful to the jury.  Jury confusion is more likely to occur if Belyus is forced to stop short of his overall conclusion regarding causation.  The jury may choose to accept or reject it according to its persuasiveness.

## IV.  <u>Conclusion</u>

For the reasons expressed above, Robinson's Motion to Exclude Testimony of Plaintiffs' Experts (ECF No. 206) is **DENIED**; plaintiffs' Motion in Limine to Exclude (A) Defense Expert Thomas M. Lyden's Causation Opinion and (B) The West Virginia Agencies Allegation (ECF No. 208) is **GRANTED** as to part A only, as the court will defer judgment on part B until the close of evidence; and Copeland's motion in limine as to Grill (ECF No. 210) and motion in limine as to Belyus (ECF No. 211) are both **DENIED,** except that Grill and Belyus must not step outside the boundaries established above.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED** this 22nd day of September, 2021.

ENTER:

David A. Faber
Senior United States District Judge

29